[In Bank. —August 30, 1883.]

SPRING VALLEY WATER WORKS, APPELLANT, *v.* SAN MATEO WATER WORKS ET AL., RESPONDENTS.

EMINENT DOMAIN— WATER COMPANIES.—A corporation having a franchise to furnish a supply of water for the use of the inhabitants of a city has the capacity to procure the appropriation of private property for that purpose by condemnation.    But this capacity is limited to the real necessity which exists for the appropriation.

NECESSITY — CONVENIENCE— ENHANCEMENT OF VALUE. — The mere facts that the acquisition of certain lands by a water company would be a great convenience to it, and would enhance the value of the property of the corporation, and secure a fuller water supply to the inhabitants of the city, do not constitute the degree of necessity required by the act providing for the taking of private property for public use.

APPEAL from a judgment of the District Court of the Twelfth Judicial District, county of San Mateo, and from an order refusing a new trial.

The facts are stated in the opinion of the court.

*Fox & Kellogg, F. G. Newlands,* and *McAllister & Bergin,* for Appellant.

The land sought to be condemned was necessary to the plaintiff within the intent· and meaning of the statute. The word " necessity " is not used in its absolute, imperative sense, but " means a want, an·exigency, an expediency, for the interest or safety of the State." (*Gilmer* v. *Lime Point,* 18 Cal. 250; *S. V. W. W.* v. *San Francisco,* 52 Cal. 121; Cooley on Const. Lim. 536–538; Code Civ. Proc. § 1240.) A large discretion is given to the corporation, which, if not abused, will not be interfered with by the courts. (Mills on Em. Dom. § 61; *Bonaparte* v. *Camden & A. R. R. Co.* 1 Bald. 224; 3 Story on Const. Lim. 117; Cooley on Const. Lim. 538; *Hentz* v. *L. I. R. R. Co.* 13 Barb. 646; *N. Y. & E. R. R.* v. *Young,* 33 Pa. St. 175; *Beekman* v. *S. & S. R. R.· Co.* 3 Paige, 73; Dwarris on Stats. and Const. 375; *In re N. Y. C. & H. R. R. R. Co.* 77 N. Y. 250; *In re Boston & Albany R. R. Co.* 53 N. Y. 574; *N. Y. C. & H. R. R. R. Co.* v. *M. Gas Light Co.* 63 N. Y. 326.) The courts may inquire whether the proposed use is a public use, but if it be such they will not interfere with the opinion of the legislature, or of the corporate body, in determining the question of necessity. (*C. R. I. & P. R. R. Co.* v. *Town of Lake,* 71 Ill. 334; *Swan* v. *Williams,* 2 Mich. 437; *Curry* v. *Mt. Sterling,* 15 Ill. 320.)

*Garber, Thornton & Bishop,* for Respondent.

The power of eminent domain should be exercised only in cases of controlling and imperative necessity. The word "necessary" as used in the statute means indispensable, not convenient. (*Southern Pacific R. R. Co.* v. *Raymond,* 53 Cal. 228; *Wilmington C. & R. Co.* v. *Dominguez,* 50 Cal. 505; *Kohl* v. *U. S.* 91 U. S. 367; *Bennett* v. *Boyle,* 40 Barb. 554; *Embury* v. *Conner,* 3 N. Y. 511; *Phillips* v. *Innes,* 4 Clark & F. 234; *Patapsco Ins. Co.* v. *Southgate,* 5 Peters, 604; 2 Parsons Contr. 276; *Carey* v. *Rae,* 8 Pac. C. L. J. 95; *Anderson* v. *Buchanan,* 8 Ind. 133; *Carbrey* v. *Willis,* 7 Allen, 370; *Gayetty* v. *Bethune,* 14 Mass. 55; Goddard on Easements, 26; *Nichols* v. *Luce,* 24 Pick. 105; 2 Bouvier's Law Dict., "Necessity"; Washburn on Ease-

ments, 3d ed. 233–235; Weeks' Damnum Absque Injuria, 17–19; *Le Coul* v. *Police Jury*, 20 La. An. 308; *Pousson* v. *Porche*, 6 La. An. 118; Pollock on Contracts, 50, 51; *Paul* v. *Detroit*, 32 Mich. 114; Borrough's Pub. § 384; *Mansfield C. W. & L. M. R. R. Co.* v. *Clark*, 23 Mich. 523; *McClary* v. *Hartwell*, 25 Mich. 139; *G. R. etc. Co.* v. *Van Driele*, 24 Mich. 409; *Ryerson* v. *Brown*, 35 Mich. 339; *McWhirter* v. *Cockrell*, 2 Head, 11; *Morris etc.* v. *City of Newmark*, 2 Stockt. Ch. 363; *New Jersey etc.* v. *Long Branch*, 39 N. J. L. 32; *Currier* v. *Marietta C. R. R. Co.* 11 Ohio St. 231; *Miami* v. *Wigton*, 19 Ohio St. 560; Cooley's Const. Law, 3d ed. 540, 541; *Matter of Albany Street*, 11 Wend. 151; *Rensselaer* v. *Davis*, 43 N. Y. 144, 145; *Reed* v. *Louisville B. Co.* 8 Bush, 72; *Jefferson* v. *Hazeur*, 7 La. An. 182; *Leisse* v. *St. Louis*, 2 Mo. App. 105; *Santa Cruz R. R. Co.* v. *Board of Sup.* 6 Pac. C. L. J. 909; *Eversfield* v. *Mid. Sussex R. R. Co.* 3 De Gex & J. 290; *Dodd* v. *Salisburg*, 2 Giff. 158; *Reg.* v. *Wycombe etc. R. Co.* Law R. 2 Q. B. 319; *Fenwick* v. *East London R. Co.* Law R. 20 Eq. 544; *Pugh* v. *Golden Valley etc. R. Co.* Law R. 12 Ch. Div. 276; *Galloway* v. *Corporation of London*, 2 De Gex, J. & S. 228; *State* v. *Fuller*, 39 N. J. L. 579; Broom's Legal Maxims, 84; *State* v. *United etc.* 43 N. J. L. 110; *New Central Coal Co.* v. *George*, 37 Md. 564; *Prather* v. *Jeffersonville*, 52 Ind. 36; *People* v. *Com. C.* 78 N. Y. 59; *S. F. & S. J. R. R. Co.* v. *Mahoney*, 29 Cal. 117; *Penn. R. R. etc. Appeal*, 8 Week. Notes of Cases, p. 313; *Boston & R. M. C.* v. *Newman*, 12 Pick. 480; *Gardner* v. *Newburgh*, 2 Johns. Ch. 165; Wade's Retroactive Laws, § 192; *People* v. *Brighton*, 20 Mich. 57–71; *Powers' Appeal*, 29 Mich. 509.

McKee, J. — This case arises out of a proceeding commenced under part 3, title 7, Code of Civil Procedure, relative to the subject of eminent domain. As shaped by the pleadings, the proceeding indirectly involves a controversy between two water corporations, each incorporated under the laws of the State, and claiming to be in charge of a public use, for which it asserts the right to appropriate private property. In the exercise of that right the plaintiff seeks, by the proceeding in hand, to comdemn twenty-eight acres of land in San Mateo County which, it alleges, form part of the canadas, valleys, and canons which, uniting near

a place in the said county known as Crystal Springs, constitute, with their creeks, streams, rivulets, lagoons, springs and catchments, the only adequate source from which the plaintiff can derive its necessary supply of water for its corporate purpose, within any distance from which water can be conducted to San Francisco, and without an expenditure of many millions of dollars more than would be required to appropriate and utilize the land in controversy, or without an expenditure greatly disproportionate to the benefit to be derived therefrom.

Admittedly, the title to the land sought to be condemned is in the defendant; which claims to have already appropriated the land to the use of the public, for its corporate purpose of appropriating and storing water for distribution and sale to the inhabitants of San Mateo County. This the plaintiff denies; but also affirms that if such appropriation has been made by the defendant, the public use to which it proposes to appropriate the land, i. e., for the corporate purpose of appropriating and storing water for distribution and sale to the inhabitants of the city and county of San Francisco, is a greater public use than that represented by the defendant.

Whether the public use represented by the plaintiff is greater than that represented by the defendant is a question subordinate to the main question involved in the proceeding itself as to the necessity for appropriating the land for the public use; and as that is a judicial question, and lies at the foundation of the right asserted by the plaintiff, it became the imperative and controlling issue in the case. (*In re N. Y. C. & H. R. R. R. Co. v. M. G. L. Co.* 63 N. Y. 326; *Kohl* v. *United States,* 91 U. S. 367.) Upon that issue the court found as follows:—

"Tenth. That the use of the said land is not a necessity to the Spring Valley Water Works, but would be a great convenience and enhance the value of its property and secure a fuller water supply to the inhabitants of San Francisco.

"Eleventh. That the present water supply of the said Spring Valley Water Works is fully equal to the wants of the people of San Francisco, and will so remain for many years—at least four years—and that a larger catchment could be secured by said Spring Valley Water Works with small expense.

"Twelfth. That said Spring Valley Water Works has other

sources of supply, which water can be utilized by it, as a good money making investment, long before the inhabitants of San Francisco will need the same."

From these facts the court found as a conclusion of law that the plaintiff was not entitled to judgment of condemnation. But it is contended that the decision is against the law and the evidence; and that is the principal question involved in the case, for the specifications of error are that the decision is not sustained by the findings, and that the findings are not sustained by the evidence.

In this court, it is incumbent upon the appellant on such a contention, to show that in the evidence upon which the findings are based, there was no substantial conflict, and that the facts and the inferences deducible from them as found by the court were contrary to the evidence. We think the evidence upon which the plaintiff rested its case justified the finding.

The evidence consisted of the testimony of the chief engineer and superintendent of the plaintiff; and it related to the sources of supply of water possessed by the plaintiff during the time over which the testimony of the witnesses extended, the increase of the population of San Francisco, the requirements of the city for water, and the constant increase from year to year of those requirements. As to those points, the evidence seems to have been *uncontradicted;* and it tended to prove that the plaintiff had obtained its supply of water for the use of San Francisco for fourteen years from certain creeks known as Pilarcitos, San Andreas, Lobos, Islais, and San Mateo. The Pilarcitos was the first source of supply, and the second was the Islais. Finding that running streams of water without storage reservoirs would be insufficient and unreliable as a source of supply, the plaintiff, in 1863, built what is known as the upper Pilarcitos dam, and in 1866–67 what is known as the lower Pilarcitos dam; and in 1867 it commenced to build on the San Andreas a reservoir which was completed in 1869; and afterwards — in 1874 — an addition was made to it.

From these sources the plaintiff had, for fourteen years, furnished water to the city of San Francisco and its inhabitants. But in 1874 the engineer of the plaintiff began to discover that the catchment and storage capacity of the sources of supply, of

which the plaintiff was then in possession, must be increased. It could not safely rely on the Pilarcitos and San Andreas combined, with all their water rights and waste water caught, to produce more than nine million gallons daily. Meanwhile the population of San Francisco was constantly increasing, and the requirements for water kept pace with the increase of population. The daily consumption of water and the increase of population were shown by the following table:—

| Year. | Population. | Daily Consumption of Water. |
|---|---|---|
| 1864 | 115,000 | 2,500,000 gallons |
| 1867 | 150,000 | 4,500,000 gallons |
| 1870 | 180,000 | 5,500,000 gallons |
| 1874 | 240,000 | 8,700,000 gallons |
| 1875 | 250,000 | 10,500,000 gallons |
| 1876 | 290,000 | 12,500,000 gallons |
| 1879 (time of trial) | 310,000 | 12,000,000 gallons |

The sources of supply were also subject to be affected by the variability of the rain fall in California. That variability from 1850 to 1876–77 was shown to have been as follows:—

| Season. | No. of Inches. |
|---|---|
| 1850–51 | 7.40 |
| 1861–62 | 49.27 |
| 1862–63 | 13.62 |
| 1863–64 | 10.08 |
| 1870–71 | 14.10 |
| 1871–72 | 34.71 |
| 1874–75 | 18.40 |
| 1876–77 | 9.87 |

Under those circumstances the capacity of the plaintiff to supply San Francisco and its inhabitants with water began to be publicly questioned. The newspaper press took up the question and its discussion agitated the public mind and caused dissatisfaction with the plaintiff so that, as the engineer expressed it, "the people that had been ordinarily using a reasonable amount of water in their households, and even with a fair allowance for waste, all of a sudden commenced to waste water so fearfully that at that rate we would not be able to keep up the supply much longer. In fact the daily demand, from 1874 until 1875,

increased to two million gallons, daily, while in former years, in ten years, the increase had been only six million gallons during the ten years, or an average of six hundred thousand gallons yearly." The plaintiff therefore found itself confronted with the question "whether it would adopt stringent measures to repress the waste or incur additional expenditure in order to provide an additional supply for the people to waste." Conference and consultation upon that question resulted in the determination upon the part of the engineer, the president, and the board of directors "to strike a medium road by partly checking the waste, and increasing the sources of supply." Waste was to be stopped by meters, and the supply increased by the acquisition of the Crystal Springs property, and the construction of reservoirs thereon. The meter experiment caused public irritation, and proving unsatisfactory it was soon abandoned. But the Crystal Springs scheme was projected and surveyed. That scheme involved the appropriation of a valley, containing about one hundred and sixty acres of land, lying back of the towns of Milbrae, San Mateo, and Belmont; bounded on the west by the coast range of mountains, and on the north and south by hills and mountains. According to the evidence, the valley was originally a natural lake, full of water, which forced an outlet through the hills of San Mateo at the place where the San Mateo Creek makes its way through the hills to San Francisco Bay. By constructing a dam at the junction of the three arms of the creek, where the passage way was made, the entire valley could be turned into an artificial lake. But instead of one lake the plaintiff designed to make three artificial lakes in the valley for the storage of water — one where the San Andreas reservoir is now constructed, another at the location of the present Crystal Springs reservoir, and the third at the junction of the three arms of the San Mateo Creek where it forces its way through the hills. By this project the plaintiff considered it could increase its supply of water about eighteen million gallons daily, and be enabled to introduce the water into San Francisco, so as to reach the various levels of the city with proper pressure and upon the gravitation plan. In the scheme Pilarcitos was designed for the highest levels, San Andreas for the levels below, and Crystal Springs for the lowest levels — the

final dam to be constructed on the latter levels to be at the three arms of the San Mateo Creek; and that was intended to meet the demand of the lowest levels of San Francisco.

In carrying out the project the plaintiff, during the summer and fall of 1874, and afterwards, purchased and acquired the title to one hundred and fifty-three acres of the land bordering on the natural lake or lagoon, which is now embraced in the present Crystal Springs reservoir, and also land in the valley below and to the north of it. Of the twenty-eight acres of the land sought to be condemned for this scheme, seven acres are covered by the waters of the lagoon, and the whole is part of a larger tract of land, which belonged to one, who, in 1874, acted as the agent of the plaintiff in making for it purchases of the lands bordering on the lagoon; but the owner was not informed that the plaintiff wanted to buy his land; nor were any steps taken to acquire the same until after it had been transferred to the San Mateo Water Company. Inferentially, therefore, the plaintiff did not consider it necessary to acquire the land in connection with the Crystal Springs scheme until after it had been transferred to another water company. Before that transfer the plaintiff had experienced no great difficulty in meeting all demands, however extravagant, for water; and at the commencement of the present proceedings it had secured other streams, water sheds, water rights, and land, with which to meet any reasonable demands which might be made upon it in the future. Those were, in addition to Pilarcitos and San Andreas, the water, water rights, and properties, which it had purchased and acquired in Lake Merced, San Francisco, Calaveras, San Gregorio, Pescadero, Clear Lake, and Lake Tahoe. Of its various sources of supply the plaintiff had utilized only Pilarcitos, San Andreas, and Lobos. Pilarcitos furnished three million gallons daily, San Andreas five million five hundred thousand gallons, and Lobos two million; and there were over two million gallons pumped out of artesian wells. San Francisco could have got along comfortably with nine million five hundred thousand gallons of water daily; and if regulated by meters, five million gallons would have been sufficient to supply the demand. One third of the water furnished was wasted, yet the supply could have been readily increased, because Merced, at

that time had been purchased; and, according to the evidence of the engineer of the plaintiff, "it would probably furnish, on an average, from five million to six million gallons a day, although, by some engineers, it was placed at seven or eight millions; and there was testimony given by some persons, who were not experts, that it would furnish ten million gallons daily. Then there was also Calaveras, consisting of about four thousand two hundred acres of land in Alameda and Santa Clara counties, with the water and water rights connected therewith, for which, it was in evidence, the plaintiff had paid one million dollars, the water from which by means of an aqueduct could be emptied into the San Andreas reservoir sufficient to furnish a supply, "deducting for evaporation and everything," of from sixty million to seventy-five million gallons daily. Next to the Crystal Springs project Calaveras was the best, but the most distant and expensive. Crystal Springs was more convenient and cheaper, at the same time Calaveras alone would furnish a supply of water four times greater than Crystal Springs.

Upon the case as it was presented by the plaintiff we cannot say that the findings of fact were not sustained by the evidence. But assuming that they were justified by the evidence, it is contended that the finding that the land in controversy would be a great convenience, and would enhance the value of the corporation and secure a fuller water supply to the inhabitants of San Francisco, satisfies the degree of necessity required by the Code (§ 1241, Code Civ. Proc.), and is, in itself, a finding that the property is necessary to the use represented.

Such things alone, however, do not constitute the elements of legal necessity. Private property contiguously situated to the works of a corporation may be very convenient for its corporate purpose, and the acquisition of the same might add to the wealth of the corporation by enhancing the value of the property which it has in hand, and yet not be reasonably necessary to the corporation in the discharge of its duty to the public. "For public uses the government has the right to exercise its power of eminent domain and take private property, giving just compensation; but for public convenience it has not. A public convenience is not such a necessity as authorizes the exercise of the right of eminent domain. The taking of private property

for public uses is in derogation of private right, and in hostility to the ordinary control of the citizen over his estate, and statutes authorizing its condemnation are not to be extended by inference or implication." (*Prather* v. *Jeffersonville R. R. Co.* 52 Ind. 36.) So in Illinois, where a railroad company undertook to condemn a portion of the ground used and occupied by the State, under a law which authorized it "to enter upon, take possession of, and use all and singular any lands, streams, and materials of every kind . . . . necessary for the construction, completion, etc., of its road," the Supreme Court of Illinois used this language: "The word 'necessary' has great flexibility of meaning. It is used to express mere convenience, or that which is indispensable to the accomplishment of a purpose. If we were compelled to say that the general assembly intended to embrace this property in the grant, we should hold that, as a condition to its appropriation to the uses of the company, it would have to appear that this property was indispensably necessary, not merely convenient or profitable to the road, but to its completion and operation. That without it the objects and purposes of the creation of the company would be defeated, and the company cease to exist. There can be but little doubt that this strip of ground would be of great convenience to the company, and we entertain as little doubt that all of the grounds and buildings thereon would also be of greater convenience, to say nothing of the saving of expenditure in the purchase of land for the use of the company. But we cannot believe that it is anything more than a matter of convenience and profit that the company should apply this ground to the purposes sought"; therefore the right to condemn was denied. And in a proceeding to condemn land for a public highway, where there was proof that a public road already existed between the proposed termini which answered all the purposes of the public, although it had been allowed to go without repairs in violation of the duty of those who had it in charge, it was held by the Supreme Court of Louisiana that there was not necessity to take private property for the same purpose. (*Le Coul* v. *The Police Jury,* 20 La. An. 308.) So where on an application by a railroad company to "expropriate" lands (as it is called in Louisiana), it appeared that the company had already a sufficient quantity for

its purpose, the Supreme Court held that the application should be denied. "The right of expropriation," says the court, "should only be enforced by inches, and upon conclusive proof of the necessity upon which it rests." (*Jefferson* v. *Hazeur*, 7 La. An. 182.) Necessity is therefore not made out by proof of great convenience, nor of enhancement of values, nor of accumulation of properties of the same kind for the same use.

Unquestionably, where the object of public use is a supply of fresh water, the public have the right to an unstinted supply, and the corporation to whom has been granted the franchise to furnish the supply has the capacity to appropriate private property for that purpose. But its capacity is limited to the real necessity which exists for the appropriation. If such a necessity exists, the individual use of property must give way to the necessity of it for the public use. But whatever may have been the opinion and judgment of the plaintiff as to the necessity in its affairs, which moved it, in 1875, to seek to appropriate this land for the use which it represents, the necessity for appropriation was disproved by its own showing that its utilized sources of supply were, and continued afterwards to be, adequate for the public requirements, and that it was entirely practicable for it, at any time, to utilize its unutilized sources, so as to increase the supply to a comparatively unlimited extent; and also by the fact that it was entirely practicable for the plaintiff to construct on its own land, just above the land of defendant, the improvement for which it seeks to condemn the defendant's land.

Utilization of the means on hand would of course incur expenditures of money; but so would the acquisition and utilization of suitable private property for the same public purpose; and it might be that the expenditures required for the former would be much greater than those required for the latter. The proofs, however, do not make out a case of financial impossibility, nor of any unreasonableness of expenditure required on the part of the plaintiff for making available its abundant resources. Indeed, it might well be inferred from the evidence of the plaintiff that the cost of utilizing its present resources would not measurably exceed the cost of acquiring and utilizing what it now seeks to condemn. But even if it ran beyond, and it were

practicable to supply the use by the additional cost, whatever it might be, there would be no need for the plaintiff to invade private property for the same use. Necessary the property might be, under such circumstances, as a matter of economy; but necessary it would not be for the public use. A corporation in charge of such a use cannot condemn whatever it may find convenient and profitable to acquire, on the ground merely that it may save expense. On that question the following language by an English judge, the master of the rolls, in *Fenwick* v. *East London Co.* Law R. 20 Eq. 544, is applicable to condemnation proceedings in our own courts: "I think the case is concluded by the authorities. I should have thought it would have been by good sense without authority, that you cannot damage your neighbor's property merely for the purpose of saving yourself a little money, where it is unnecessary for the construction of the railway."

This being conclusive of the case, it is unnecessary to consider the other questions arising out of the record.

Judgment and order affirmed.

Thornton, J., Myrick, J., McKinstry, J., and Ross, J., concurred.

Sharpstein, J., was not present at the argument.

Petition for rehearing denied.